1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RICHARD JAMES MURATALLA,              No.  1:15-cv-00586-AWI-JLT (HC)

12              Petitioner,                **FINDINGS AND RECOMMENDATION**
                                           **TO DENY PETITION FOR WRIT OF**
13        v.                               **HABEAS CORPUS**

14   WILLIAM MUNIZ, Warden,                **[TWENTY-ONE DAY OBJECTION**
                                           **DEADLINE]**
15              Respondent.

16

17        Petitioner is currently in the custody of the California Department of Corrections and

18   Rehabilitation serving an indeterminate sentence of 40 years-to-life for his conviction on

19   September 19, 2011, in Kern County Superior Court of attempted first degree murder, assault

20   with a firearm, carrying a loaded firearm in a public place while an active gang member, being a

21   felon in possession of a firearm, and unlawful taking of a vehicle.  In this action, Petitioner

22   claims: 1) A gang expert conveyed testimonial hearsay to the jurors in violation of his right to

23   confrontation; 2) The evidence was insufficient to support the jury's findings of "primary

24   activities," and 3) Defense counsel failed to competently execute his trial strategy which

25   constituted ineffective assistance of counsel.  The Court disagrees and recommends the petition

26   be **DENIED.**

27   **I.     PROCEDURAL HISTORY**

28        As stated above, Petitioner was convicted in the Kern County Superior Court on

                                           1

1   September 19, 2011, of attempted first degree murder (Cal. Penal Code §§ 664/187(a)), assault

2   with a firearm (Cal. Penal Code § 245(a)(2)), carrying a loaded firearm in a public place while an

3   active gang member (formerly Cal. Penal Code § 12031(a)(2)(c)), being a felon in possession of a

4   firearm (former Cal. Penal Code § 12021), and unlawful taking of a vehicle (Cal. Penal Code §

5   10851(a)).  People v. Muratalla, #F063394, 2014 WL 280624, at *1 (Cal. Ct. App. January 24,

6   2014); (CT[1] 210-223.).  The jury also found true enhancements for using a firearm (Cal. Penal

7   Code §§ 12022.53(d) & 12022.5(a)), inflicting great bodily injury (Cal. Penal Code § 12022.7),

8   and promoting a criminal street gang (Cal. Penal Code § 186.22(b)(1)).  Id.  He is currently

9   serving an indeterminate 40 years-to-life sentence.  Id.

10          Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

11   DCA").  The Fifth DCA reduced the count of carrying a loaded firearm while an active gang

12   member to the lesser-included misdemeanor offense of carrying a loaded firearm (Cal. Penal

13   Code § 12031(a)(2)(G)), due to insufficient evidence that Petitioner committed the offense in

14   concert with another gang member as required by People v. Rodriguez, 55 Cal.4th 1125 (2012).

15   Muratalla, 2014 WL 280624, at *14.  The matter was remanded to the superior court for

16   resentencing on the reduced misdemeanor count.  In all other respects the judgment was affirmed.

17   Id.  Upon remand, the Kern County Superior Court resentenced Petitioner to a concurrent term of

18   365 days in jail on count 3.  (LD[2] 7.)  Therefore, the aggregate term of 40 years-to-life remained

19   unchanged.  Id.  Petitioner next filed a petition for review in the California Supreme Court.  The

20   petition was summarily denied.  (LD 5, 6.)

21          On April 16, 2015, Petitioner filed the instant Petition for Writ of Habeas Corpus in this

22   Court.  (Doc. No. 1).  Respondent filed an answer on July 20, 2015.  (Doc. No. 13).  Petitioner

23   filed a Traverse to Respondent's answer on August 19, 2015.  (Doc. No. 15.)

24   **II.     FACTUAL BACKGROUND**

25          The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[3]:

26   _____

27   [1] "CT" refers to the Clerk's Transcript on Appeal which has been lodged with the Court by Respondent.

     [2] "LD" refers to the documents lodged with the Court by Respondent.

28   [3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
     Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir.

2

As Fernando Delarosa walked on a street near his home in Bakersfield on the afternoon of March 31, 2010, an off-white Chevrolet Camaro pulled up beside him. Muratalla got out and asked if he was Fernando Delarosa from Southside. Delarosa recognized Muratalla as Oso from Loma Bakers. Southside and Loma Bakers are both subsets of the Sureño criminal street gang, and are not rivals of one another. Among members of non-rival subsets there are sometimes conflicts between individuals, however. Delarosa said he was from Southside. Muratalla announced that he was from Loma Bakers and that he was going to follow Delarosa. Delarosa understood Muratalla's gang-oriented comments as a challenge to fight. He did not want to fight and told Muratalla to leave. Muratalla said "fuck this," drew a pistol from his pants and fired four shots. One hit Delarosa in the buttocks as he fled. The bullet exited his left thigh and came to rest in his right thigh. He ran into a barbershop and called 911.

Delarosa told officers he knew Muratalla from jail. He described the car and the gun. A week later, police found the Camaro. It had been reported stolen on the day of the shooting. Inside was a .22–caliber handgun with four spent shell casings and two live rounds in the cylinder. The car also contained a green canvas bag with more live ammunition inside. Muratalla's palm print was found on the inside of the driver's door. DNA on the green bag matched Muratalla's DNA profile and he was a possible contributor of DNA found on the gun.

[¶] . . . [¶]

Muratalla's defense at trial was that the shooting was not attempted murder because it was not proved that he was trying to kill Delarosa. He also claimed the shooting arose from a dispute between him and Delarosa over a woman, so it was not proved that the shooting was gang-related.

Muratalla, 2014 WL 280624, at *1–2.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

2009).

enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under §

4

2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Claims

The instant petition presents the following grounds for relief: 1) A gang expert conveyed testimonial hearsay to the jurors in violation of his right to confrontation; 2) The evidence was insufficient to support the jury's findings of "primary activities," and 3) Defense counsel failed to competently execute his trial strategy which constituted ineffective assistance of counsel.

*1.*     Gang Expert Testimony

a.     State Court Opinion

Petitioner contends that the prosecution's gang expert relied on testimonial hearsay evidence and that this reliance violated the Confrontation Clause of the Sixth Amendment.  The claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned

1  decision.

2      The appellate court summarized the background facts as follows:

3      Bakersfield Police Officer Travis Harless testified for the prosecution as an expert
       on gangs to establish the gang-relatedness of the shooting. To prove the elements
4      of gang-relatedness under section 186.22, subdivision (b), Harless described to the
       jury, and relied upon, all of the following: records of the 16 times Muratalla had
5      been booked into the county jail; 19 offense reports involving Muratalla, three of
       which Harless discussed in detail; police reports and probation reports describing
6      crimes committed by four other Loma Bakers members; and oral statements by
       various Loma Bakers and other gang members about the customs and activities of
7      Sureño gangs in Bakersfield.

8  Muratalla, 2014 WL 280624, at *4.

9      The appellate court then rejected the claim, citing the opinion in People v. Thomas, 130

10 Cal.App.4th 1202 (2005), where the court rejected an identical claim challenging a gang expert's

11 recitation of hearsay statements:

12     [The petitioner's] argument is based on Crawford v. Washington (2004) 541 U.S.
       36, 53–54 (Crawford), in which the United States Supreme Court held that
13     admission of "testimonial" hearsay violates the confrontation clause unless the
       declarant is unavailable and the defendant had a prior opportunity to cross-
14     examine him or her. The court did not provide a definitive statement of the
       meaning of "testimonial" hearsay, but one definition it mentioned with approval
15     was: "'statements that were made under circumstances which would lead an
       objective witness reasonably to believe that the statement would be available for
16     use at a later trial.'" (Id. at p. 52.)

17         . . .

18     In People v. Thomas (2005) 130 Cal.App.4th 1202 (Thomas), which the trial court
       was bound to follow, the Court of Appeal held that the admission of similar
19     hearsay did not contravene Crawford.  [¶]  In Thomas, a prosecution gang expert
       testified to establish the elements of the offense of gang participation under section
20     186.22, subdivision (a). (Thomas, supra, 130 Cal.App.4th at pp. 1205, 1207.) The
       expert testified that much of his expertise came from statements made by other
21     officers and by gang members. (Id. at p. 1207.) His opinion that the defendant was
       a gang member was based in part on information he found in police reports and
22     statements of gang members who said the defendant was a member. (Id. at p.
       1206.) The defendant argued that the admission of the gang expert's testimony
23     about the statements of other gang members violated the confrontation clause as
       interpreted in Crawford. (Thomas, supra, at p. 1208.)
24
       The Court of Appeal rejected this argument. It cited People v. Gardeley (1996) 14
25     Cal.4th 605, 618–619, which held that under Evidence Code sections 801 and 802,
       an expert's opinion can be based on otherwise inadmissible evidence and the
26     expert can testify about that basis if questioned. The Thomas court explained that
       this holding survived Crawford:
27
           "Crawford does not undermine the established rule that experts can testify
28         to their opinions on relevant matters, and relate the information and sources

6

> upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*Thomas, supra*, 130 Cal.App.4th at p. 1210.)

*Muratalla*, 2014 WL 280624, at *3–4.

The Fifth DCA then addressed the Supreme Court's intervening decision in <u>Williams v. Illinois</u>, __ U.S. __, 132 S.Ct. 2221 (2012).  The appellate court determined that there was no reason to depart from its decision in <u>Thomas</u> based on the Supreme Court's decision.  The court stated:

> In contending that *Crawford* means the evidence the expert relied on and testified about should have been excluded, and that we should not follow *Thomas*, Muratalla cites *Williams v. Illinois* (June 18, 2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*). As we will explain, there was no majority opinion in that case, and Muratalla does not rely on the case's outcome (finding no constitutional violation). He relies instead on statements in Justice Kagan's dissenting opinion (joined by three other justices) and in Justice Thomas's opinion concurring in the judgment.
>
> Williams underwent a bench trial for rape. A technician from a state laboratory testified that she analyzed a blood sample taken from Williams after his arrest and developed a DNA profile. (*Williams, supra*, 132 S.Ct. at p. 2229.) Another prosecution expert testified that she compared that profile with a profile developed by a commercial laboratory from semen found on the victim. (*Id*. at pp. 2229–2230.) The expert testified that the profile from Williams's blood and the profile from the semen on the victim's body matched. (*Id*. at p. 2230.) No one from the commercial laboratory testified, and the expert's implication that the data received from the commercial laboratory constituted an accurate profile developed from the semen found on the victim was based on a hearsay statement, namely, the commercial laboratory's report. (*Id*. at pp. 2230, 2235–2236.) There was also chain-of-custody evidence tending to show that the state laboratory sent the semen samples taken from the victim's body to the commercial laboratory. (*Id*. at p. 2230.)
>
> Williams argued that the expert's implicit affirmation that the results received from the commercial laboratory were a profile of the DNA found on the victim was based on testimonial hearsay and should have been excluded under *Crawford*. (*Williams, supra*, 132 S.Ct. at pp. 2235–2236.) Justice Alito, in a plurality opinion that announced the judgment of the court but was joined only by Chief Justice Roberts and Justices Kennedy and Breyer (id. at p. 2227), rejected this argument on the grounds like those relied on in *Thomas*, i.e., that the hearsay was not admitted to prove the truth of the matter it asserted. (*Williams, supra*, 132 S.Ct. at p. 2236.) That the profile from the commercial laboratory was developed from the semen on the victim was "a mere premise of the prosecutor's question" which the expert "simply assumed ... to be true when she gave her answer indicating that there was a match between the two DNA profiles." The import of the expert's

statement was only that the two samples she compared matched each other. She was not testifying about where the samples came from, a matter that was established by other evidence. (*Ibid*.) Since it was a bench trial, there was no danger of the trier of fact failing to understand this. (*Id*. at pp. 2236–2237.)

As an alternative theory, Justice Alito's opinion also stated that the commercial laboratory's report, even if statements about it were admitted for the truth of the matter asserted, was not testimonial because it "was not prepared for the primary purpose of accusing a targeted individual." (*Williams, supra*, 132 S.Ct. at p. 2243.) Instead, when the state laboratory sent the semen sample to the commercial laboratory, "its primary purpose was to catch a dangerous rapist who was still at large...." (*Ibid*.)

Justice Thomas concurred in the judgment, adding the fifth vote necessary to affirm the lower courts' conclusion. (*Williams, supra*, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).) He rejected, however, the plurality's view that statements from the commercial laboratory's report were not admitted for the truth of the matter they asserted. (*Id*. at p. 2256.) "[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth," since the factfinder must decide whether the statement is true before evaluating the expert's opinion. (*Id*. at p. 2257.) That other evidence might have established the same fact is not relevant to the constitutional analysis: "The existence of other evidence corroborating the [facts forming the basis of the expert's opinion] may render any Confrontation Clause violation harmless, but it does not change the purpose of such testimony and thereby place it outside the reach of the Confrontation Clause." (*Id*. at p. 2258.)

Justice Thomas agreed with the plurality's result for a different reason: the hearsay was not testimonial, but not for the same reason the plurality thought it was not testimonial. In Justice Thomas's view, "the Confrontation Clause reaches '"formalized testimonial materials,"' such as depositions, affidavits, and prior testimony, or statements resulting from '"formalized dialogue,"' such as custodial interrogation." (*Williams, supra*, 132 S.Ct. at p. 2260.) The commercial laboratory's report "lacks the solemnity" of these types of materials and therefore was not testimonial. (*Ibid*.)

Justice Kagan wrote a dissenting opinion joined by Justices Scalia, Ginsburg and Sotomayor. (*Williams, supra*, 132 S.Ct. at p. 2264 (dis. opn. of Kagan, J.).) Like Justice Thomas, the dissenters concluded that information from the commercial laboratory's report was admitted through the expert for the truth of the matter it asserted. "[W]hen a witness, expert or otherwise, repeats an out-of-court statement as the basis of a conclusion ... the statement's utility is then dependent on its truth." (*Id*. at p. 2268.) Further, the hearsay was testimonial because the commercial laboratory's report was "in every conceivable respect, a statement meant to serve as evidence in a potential criminal trial." (*Id*. at p. 2275.)

Muratalla argues that we should combine Justice Thomas's opinion with Justice Kagan's opinion to create Supreme Court authority for the view that the evidence here at issue is testimonial hearsay, the admission of which violated the confrontation clause. Those opinions, however, do not add up to that view. They might add up to five votes for the conclusion that the evidence challenged here was admitted for the truth of the matter asserted, since Justice Thomas and the dissenters agree that the evidence disclosed as the basis of an expert's opinion must

be true to support that opinion. But there were not five votes for any view of when statements are testimonial. The plurality thought the evidence at issue was not testimonial for one reason, Justice Thomas thought it was not testimonial for a different reason, and the dissenters thought it was testimonial under yet a third rationale. The five justices withholding their votes from the plurality's position might not agree that the evidence on which Officer Harless relied was testimonial hearsay. In light of this, the various opinions in *Williams* do not amount to authority for Muratalla's position.

In any event, it is not our practice to piece together various non-majority opinions by Supreme Court justices for the purpose of anticipating what that court's conclusions might be in a case it has not considered. All we can say about *Williams* is that it upheld the admission of the testimony at issue and that there was no majority rationale. *Williams* fails to support Muratalla's position for this reason as well.

We see no adequate reason to depart from the analysis in *Thomas*, and the proper approach, in our view, is to follow *Thomas* unless and until there is authority to do otherwise. To hold that the gang expert's testimony in this case violated the confrontation clause would imply that section 186.22 prosecutions as currently practiced are unconstitutional in general, and alternative methods would be hard to find. The expert here was typical in his reliance on myriad items of hearsay from numerous police officers, probation officers and gang informants. Presenting all those witnesses at trial would be an obstacle all but insuperable. We will not impose that obstacle absent clear authority requiring it.

Muratalla, 2014 WL 280624, at *4–6.

### b.   Federal Standard

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const ., Amend. VI.  The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"  Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24.  "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at 824. As the Davis court explained:

[a] critical portion of [Crawford's] holding ... is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of

the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Davis, 547 U.S. at 821 (citation omitted).  Thus, nontestimonial statements do not implicate the Confrontation Clause.  Giles v. California, 554 U.S. 353, 376 (2008).  Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n. 9.  Additionally, a Confrontation Clause violation is subject to harmless error analysis.  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

"Although Crawford did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir.2008) (quoting Crawford, 541 U.S. at 51).  Subsequent Supreme Court cases have suggested that a statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events.  See Williams v. Illinois, __U.S. __, __, 132 S.Ct. 2221, 2242 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."); Melendez–Diaz v. Massachusetts, 557 U.S. 305 (2009) (opining that a statement is "testimonial" if it was made for an "evidentiary purpose" and "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (internal citation and quotation marks omitted).

10

1    c.  Analysis

2    Here, the state court applied the correct legal standard under the Sixth Amendment by

3  applying Crawford, 541 U.S. 36, and Williams, 132 S.Ct. 2221.  Thus, the only question

4  remaining is whether the state court's adjudication is objectively unreasonable.  The Court

5  concludes that it is not.

6    First, the state court reasonably determined that the statements relied upon by the gang

7  expert were not testimonial in nature.  The gang expert in this case relied on police reports,

8  offense reports, probation reports, and oral statements from gang members concerning the

9  activities and customs of Sureño gangs in Bakersfield.  The Confrontation Clause applies only to

10  "witnesses against the accused, i.e., those who bear testimony," therefore, it could apply only to

11  the oral statements relied upon by the expert.  Crawford, 541 U.S. at 51.  Here, the state court was

12  not unreasonable in concluding that such oral statements could not be considered testimonial in

13  nature, because they bore no resemblance to formalized statements such as affidavits, depositions,

14  prior testimony, or confessions.  Williams, 132 S.Ct. at 2242.  Thus, the statements relied upon by

15  the gang expert did not violate the Confrontation Clause.

16    In addition, the state court reasonably concluded that the statements, even if considered

17  testimonial in nature, were not offered for their truth but only to inform the gang expert's opinion.

18  For this reason as well, the gang expert's opinion could not violate the Confrontation Clause.

19    Moreover, the state court correctly noted that there is no clearly established Supreme

20  Court precedent finding a violation of the Confrontation Clause resulting from the admission of

21  an expert's opinion based on hearsay statements.  In Williams, a majority of the Supreme Court

22  found that the laboratory results from a nontestifying technician which informed the expert

23  witness were not testimonial and therefore did not violate the Confrontation Clause.  Williams,

24  132 S.Ct. at 2240, 2242-43.  Also, a plurality concluded that the laboratory results were admitted

25  for the nonhearsay purpose of "illuminating the expert's thought process" rather than establishing

26  the truth of the matter asserted.  Id. at 2240.  Because the Supreme Court has provided no clear

27  answer to this question, "it cannot be said that the state court unreasonabl[y] appli[ed] clearly

28  established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008).

1    Even if there was error, the petitioner is not entitled to relief because the admission of the

2    gang expert's testimony did not have a "substantial and injurious effect or influence on the jury's

3    verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  As Respondent points out, there was

4    substantial evidence that the shooting was gang-related independent of the expert's testimony.

5    When the petitioner contacted the victim, he immediately asked him if he was "Fernando

6    Delarosa" of the "Southside" gang.  (RT 63-66.)  Petitioner identified himself as being of the

7    "Loma Bakers" gang.  (RT 63-66.)  Delarosa testified that he had previously participated in a

8    gang-related attack on Petitioner.  (RT 83-86.)  In addition, Petitioner's body was covered in gang

9    tattoos.  (RT 359-62.)  Finally, the court dockets from five separate criminal cases, one of which

10   included the petitioner's prior offense, established the predicate offenses and primary criminal

11   activities of the Loma Bakers gang. (CT 141; RT 382-84.)  Accordingly, any error stemming

12   from the admission of the expert's opinion would have made no difference to the jury's verdict

13   that the attempted murder was committed "for the benefit of" the Loma Bakers gang and with the

14   "specific intent to promote, further, or assist in any criminal conduct" by Loma Bakers gang

15   members.  Cal. Penal Code § 186.22(b)(1).

16   Therefore, the petitioner is not entitled to habeas relief because the state court decision

17   was not contrary to or an unreasonable application of clearly established Supreme Court

18   precedent.  And even if error occurred, it could have had no effect on the jury's verdict.  The

19   claim should be denied.

20       2.    *Insufficient Evidence to Support "Primary Activities" Element*

21            a.    State Court Opinion

22   In his next claim for relief, Petitioner argues that there was insufficient evidence to

23   support the requisite finding of "primary activities" as an element for the gang enhancement

24   under Cal. Penal Code § 186.22(b)(1).  He contends that the gang expert's testimony that Loma

25   Bakers gang members rarely possessed firearms necessarily negated his opinion that the primary

26   activities of the Loma Bakers included assaults with a firearm and illegal possession of a firearm.

27   He claims that the gang expert's reference to three assaults committed by the Loma Bakers gang

28   over a period of five years was insufficient to show the gang's primary activities involved such

12

assaults.   The claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned decision.

The appellate court summarized the background facts as follows:

Muratalla argues that the evidence was insufficient to support the jury's finding on the gang enhancement allegations pursuant to section 186.22, subdivision (b). "When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)

To prove a section 186.22, subdivision (b) gang enhancement, the prosecution must show that the defendant committed the charged offense "for the benefit of, at the direction of, or in association with any criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) To prove that the group in association with which the defendant committed the offense is a criminal street gang, the prosecution must establish that it is a group "of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [elsewhere in the statute], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

In *People v. Sengpadychith* (2001) 26 Cal.4th 316 (*Sengpadychith*), our Supreme Court discussed the types of evidence that can establish the primary activities prong. Expert testimony can be sufficient to prove this prong. As an example, the court described a case in which a police expert testified that the defendant "had for nine years been a member ... primarily engaged in the sale of narcotics and witness intimidation.... The gang expert based his opinion on conversations he had with [the defendant] and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies." (*Id.* at p. 324.) Specific instances of past or current enumerated criminal acts by gang members are also relevant to the primary activities issue. (*Id.* at p. 323.) If all the evidence presented by the prosecution establishes only occasional commission of enumerated criminal acts by members of the defendant's gang, then the primary activities element is not proven. (*Id.* at pp. 323–324.)

Officer Harless testified that he had been a member of the police department's gang unit for just over a year and went to the Loma Bakers' territory almost every day while on duty. He spoke to gang members daily and often arrested them for gang-related crimes. From these contacts, he learned the boundaries of the Loma Bakers' territory, their rivalries and alliances, and their primary activities. Asked about the Loma Bakers' primary activities, he testified: "[T]hey commit property crimes, different kinds of thefts. They commit assaults on rivals. They commit assaults with firearms, illegal firearm possession, things like that."

Harless also testified about specific instances of criminal acts by Loma Bakers members. Rene Cazares possessed methamphetamine for sale in 2003. Mario Gomez and Michael Soto committed an assault with a deadly weapon (a baseball

bat) in 2005. Andres Ibarra was a felon in possession of a firearm in 2008.

Muratalla first argues that Harless's testimony was insufficient evidence to support the primary activities element because some of his remarks showed that he did not have a proper understanding of the meaning of primary activities. Harless testified that illegal firearm possession was a primary activity of the Loma Bakers, but he later gave an affirmative answer when asked if it was "actually rare that you'll contact with a Loma Baker who has a gun." Muratalla argues that because a primary activity cannot be one that a gang's members engage in only occasionally, Harless must have misunderstood what a primary activity is and therefore his testimony about the Loma Bakers' primary activities cannot establish that element.

As the People point out, however, other testimony given by Harless explains how he could consistently say both that firearm possession is a primary activity of the Loma Bakers and that members of the Loma Bakers are not often found with firearms. Explaining how Bakersfield gangs manage their stocks of firearms to avoid detection, Harless said that gangs often "keep them in a central location, maybe a vacant house or at a person's house where they know there's nobody on probation or parole so it's less likely law enforcement is going to go to that location...." Members wanting a gun to commit a crime then know where to go to obtain one. This testimony shows how illegal firearm possession can be a primary activity of a gang even though most of the gang's members carry a gun only infrequently. Harless therefore did not exhibit any misunderstanding of the term "primary activities" and there is no reason for us to hold that his testimony using that term should be disregarded in the sufficiency-of-evidence analysis.

Muratalla points out Harless never said the Loma Bakers keep guns in a central location, but that is beside the point. Muratalla's argument is that Harless's statements about the Loma Bakers' possession of guns were inconsistent, and therefore not substantial evidence. The fact that a gang—any gang—can have guns in a central location, available to members at all times even though most members usually are not in actual possession, shows that Harless's statements were not inconsistent.

Muratalla next argues that the People did not show a large enough number of specific criminal acts by Loma Bakers members. The three prior crimes by four members, plus the current offense, make only four incidents over a period of seven years. This, Muratalla contends, proves no more than occasional commission of enumerated offenses by Loma Bakers members.

There is, however, no rule that any particular number of offenses over any particular time period must be shown to establish that committing enumerated crimes is a primary activity of a gang. As we have said, expert testimony based on field experience can be evidence sufficient to prove the primary activities element. Muratalla cites cases in which small sets of specific instances of criminal conduct were held to be insufficient to show a gang's primary activities, but in each of those cases there was no expert testimony stating that the gang committed enumerated crimes as a primary activity, or else the expert testimony lacked foundation. (*People v. Perez* (2004) 118 Cal.App.4th 151, 160; *In re Alexander L.* (2007) 149 Cal.App.4th 605, 614.)

We conclude that Officer Harless's opinion testimony and his testimony about specific offenses committed by Loma Bakers members constituted substantial evidence that the Loma Bakers' primary activities included the commission of crimes enumerated in section 186.22. Muratalla's arguments that Harless

1  contradicted himself and did not discuss a sufficient number of specific instances

2  are without merit.

3  Muratalla, 2014 WL 280624, at *6–8).

4          b.      Federal Standard

5          The law on sufficiency of the evidence is clearly established by the United States Supreme

6  Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

7  307, the test on habeas review to determine whether a factual finding is fairly supported by the

8  record is as follows:

9          [W]hether, after viewing the evidence in the light most favorable to the
           prosecution, any rational trier of fact could have found the essential elements of
10         the crime beyond a reasonable doubt.

11 Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no

12 rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner

13 be entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the

14 elements defined by state law.  Id. at 324, n. 16.

15         If confronted by a record that supports conflicting inferences, a federal habeas court "must

16 presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

17 such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

18 Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

19 conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

20         After the enactment of the AEDPA, a federal habeas court must apply the standards of

21 Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

22 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

23 correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

24 477 U.S. 436, 459 (1986).

25         In Cavazos v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court

26 further explained the highly deferential standard of review in habeas proceedings, by noting that

27 Jackson,

28         makes clear that it is the responsibility of the jury - not the court - to decide what

conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 3.[4]

c.      Analysis

Petitioner's claim that the expert witness's conflicting testimony constituted insufficient evidence fails at the outset on federal habeas review. As noted above, the Supreme Court has held that where a reviewing court is faced with "a record that supports conflicting inferences, a federal habeas court must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

In any case, the claim is without merit. Cal. Penal Code § 186.22(b)(1) states, in relevant part:

[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, . . . be punished . . . .

The statute defines "criminal street gang" as "any ongoing organization, association or group . . . having as one of its primary activities the commission of one or more" enumerated "criminal acts," which include, *inter alia*, assault with a deadly weapon, grand theft, and unlawful possession of a firearm. Cal. Penal Code §§ 186.22(f), (e)(1), (e)(9), (e)(31). The term "primary activities" is defined as "one of the group's 'chief' or 'principal' occupations." People v. Sengpadychith, 26 Cal.4th 316, 323 (2001). Further, sufficient proof "might be expert testimony"

---

[4] To the extent that the Fifth DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings. People v. Johnson, 26 Cal.3d 557, 576 (1980). Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

1    such as a "police gang expert." Id. at 324.

2         Here, the gang expert testified that the primary activities of the Loma Bakers gang

3    included "property crimes, different types of thefts," "assaults on rivals," and "assaults with

4    firearms, illegal firearm possession."  (RT 321.)  His testimony was based on his training and

5    daily interactions with gang members, including the Loma Bakers gang. (RT 314-18, 322.)  The

6    expert recounted two specific instances where Loma Bakers gang members committed such

7    crimes, including: 1) In 2005, Loma Bakers gang members Mario Gomez, Michael Soto, and

8    Hector Chavez were arrested and convicted for assault with a deadly weapon and gang

9    participation; and 2) In 2008, Loma Bakers gang member Andres Ibarra was found guilty of

10   being a felon in possession of a firearm.  (RT 331-35.)  In light of the above, the gang expert's

11   testimony provided sufficient proof that the Loma Bakers gang's primary activities constituted

12   several of the enumerated criminal acts set forth in the statute.  Petitioner fails to show that the

13   state court conclusion was unreasonable.

14        In addition, the gang expert further discussed the manner in which gangs typically possess

15   firearms.  The expert stated that although it was rare for an individual gang member to be found

16   in possession of a firearm, the gang would usually keep all of the gang's firearms at a central

17   location.  (RT 337-39.)  Thus, whenever a gang member needed a firearm, he would go to the

18   gang's repository and pick up a firearm for use in whatever gang activity was being conducted.

19   (RT 339.)  In this manner, the gang's primary activities could involve using firearms even though

20   an individual gang member would rarely be found in possession of one.  (RT 338-39.)  In light of

21   the gang expert's explanation, there is no apparent contradiction between the expert's testimony

22   that a gang's primary activity could include firearms even though an individual gang member

23   would rarely be found in possession of one.  Accordingly, the petitioner fails to demonstrate that

24   the gang expert's testimony was insufficient.

25        Petitioner also argues that the two specific instances were insufficient to support the

26   expert's conclusion that such acts were the Loma Bakers' primary activities.  However, the state

27   court found that there was no minimum number of specific instances required under the statute.

28   This Court is bound by the state court's interpretation of state law.  Bradshaw v. Rickey, 546 U.S.

1   74, 76 (2005).

2         Therefore, the petitioner fails to demonstrate that the state court decision was objectively

3   unreasonable, and the claim should be denied.

4         *3.     Ineffective Assistance of Counsel*

5         a.    <u>State Court Opinion</u>

6         Last, the petitioner claims trial counsel rendered ineffective assistance in the following

7   ways: 1) Failing to conduct a more extensive voir dire; 2) Failure to give an opening statement; 3)

8   Failure to object to evidence of "other crimes;" 3) Failure to give a more in depth closing

9   argument; and 4) Failure to object to the prosecutor's rebuttal.  The claim was presented on direct

10   appeal to the Fifth DCA, where it was rejected in a reasoned decision:

> Muratalla argues that several aspects of his trial counsel's performance amounted
> to a deprivation of the effective assistance of counsel guaranteed by the Sixth
> Amendment. To establish ineffective assistance of counsel, a defendant must show
> that counsel's performance "fell below an objective standard of reasonableness,"
> and that "there is a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different." (*Strickland v.
> Washington* (1984) 466 U.S. 668, 688, 694; *see also People v. Hester* (2000) 22
> Cal.4th 290, 296.) Our review of trial counsel's actions is deferential. To establish
> that counsel's actions were objectively unreasonable, the appellate record must
> affirmatively show that counsel had inadequate reasons for taking those actions, or
> else that there simply could not possibly be any good reason for them. (*People v.
> Kipp* (1998) 18 Cal.4th 349, 367.) Further, it is not necessary to determine whether
> counsel's challenged action was professionally unreasonable in every case. If the
> reviewing court can resolve the ineffective assistance claim by proceeding directly
> to the issue of prejudice—i.e., the issue of whether there is a reasonable
> probability that the outcome would have been different absent counsel's challenged
> actions or omissions—it may do so. (*Strickland v. Washington, supra,* at p. 697.)
> Muratalla has not established that his counsel's alleged errors amounted to
> ineffective assistance either separately or cumulatively.

21   <u>Muratalla</u>, 2014 WL 280624, at *8.

22         b.    <u>Federal Standard</u>

23         Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

24   Amendment.  <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

25   counsel are reviewed according to <u>Strickland</u> 's two-pronged test.  <u>Miller v. Keeney</u>, 882 F.2d

26   1428, 1433 (9th Cir. 1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th Cir.1986); <u>see also</u>

27   <u>Penson v. Ohio</u>, 488 U.S. 75(1988) (holding that where a defendant has been actually or

28   constructively denied the assistance of counsel altogether, the <u>Strickland</u> standard does not apply

1    and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel is present

2    but ineffective).

3           To prevail, Petitioner must show two things.  First, he must establish that counsel's

4    deficient performance fell below an objective standard of reasonableness under prevailing

5    professional norms.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984).  Second, Petitioner

6    must establish that he suffered prejudice in that there was a reasonable probability that, but for

7    counsel's unprofessional errors, he would have prevailed on appeal.  <u>Id</u>. at 694.  A "reasonable

8    probability" is a probability sufficient to undermine confidence in the outcome of the trial.  <u>Id</u>.

9    The relevant inquiry is not what counsel could have done; rather, it is whether the choices made

10   by counsel were reasonable.  <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998).

11          With the passage of the AEDPA, habeas relief may only be granted if the state-court

12   decision unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.

13   <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

14   federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect

15   but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v.</u>

16   <u>Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles</u>, 556 U.S. at 123.  In effect, the AEDPA standard

17   is "doubly deferential" because it requires that it be shown not only that the state court

18   determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.</u>

19   <u>Gentry</u>, 540 U.S. 1, 5 (2003).  Moreover, because the <u>Strickland</u> standard is a general standard, a

20   state court has even more latitude to reasonably determine that a defendant has not satisfied that

21   standard.  <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

22   application was unreasonable requires considering the rule's specificity.  The more general the

23   rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

24          Here, the state court identified the appropriate federal standard by applying <u>Strickland</u>.

25   Thus, the only question remaining is whether the state court's adjudication that defense counsel's

26   representation was neither deficient nor prejudicial was an unreasonable application of <u>Strickland</u>.

27   For the reasons discussed below, the Court concludes that it was not.

28   ///

c.      Analysis

i.      *Voir Dire*

Petitioner first claims that defense counsel was ineffective in failing to adequately voir dire the jury panel.  He faults counsel for failing to ask enough questions to uncover any pro-prosecutor bias, and failing to challenge certain jurors for cause or peremptorily.  Petitioner further faults counsel for failing to ask any questions of any prospective alternate jurors.  Also, he states counsel failed to ask any questions concerning gangs, the presumption of innocence, proof beyond a reasonable doubt, a defendant's right not to testify, and whether prospective jurors or those close to them had been victims of violent crime.

The state court rejected this claim of ineffective assistance, as follows:

Muratalla contends that his counsel acted unreasonably in conducting voir dire during jury selection. Specifically, he did not challenge for cause or excuse via peremptory challenge (though he left many of his peremptory challenges unused) two prospective jurors who were employed in law enforcement. One juror was a juvenile correctional officer who had received some gang-related training and who had a brother who was a California Highway Patrol officer. The other wrote reports and petitions at the Kern County Probation Department and also had received gang-related training. Both served on the jury. Another prospective juror was a nurse employed by the California Department of Corrections and Rehabilitation. Muratalla's counsel did not challenge her and she became an alternate, and ultimately served as a juror when a seated juror was excused before opening statements. More generally, Muratalla says counsel unreasonably failed to question jurors to find indications of bias. He says counsel did not ask any prospective jurors whether they had an inclination to favor testimony by law enforcement personnel, did not follow up when a prospective juror, who ultimately served on the jury, said her daughter had been a victim of a violent crime but her ability to serve would not be affected, and did not ask the prospective alternates any questions. The jury foreperson was not asked whether anyone close to her worked in law enforcement or had been a victim of a violent crime.

The record does not disclose trial counsel's reasons for allowing the correctional officer, the probation department employee and the prison nurse to serve. As we have said, counsel's actions cannot be found unreasonable based on a silent record unless there simply could be no valid reason for them. The exercise of peremptory challenges is """"inherently subjective and intuitive [and] an appellate record will rarely disclose reversible incompetence in this process.""" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 48.) There could have been other reasons why counsel found these three jurors acceptable or even desirable compared with others who might have served had these three been excused.

Similarly, the record does not show that there were no sound tactical reasons for counsel's decision to refrain from asking certain questions about bias in favor of law enforcement personnel. It has been held that even asking no questions can be a sound tactical approach. "For example, questioning by other parties may convince counsel that the juror would be favorable for the defense, and that further

questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause." (*People v. Freeman* (1994) 8 Cal.4th 450, 485; *see also People v. Horton* (1995) 11 Cal.4th 1068, 1123 [professionally unreasonable conduct not shown where counsel's decision not to ask prospective jurors about racial bias could have been result of sound tactical decision].)

Muratalla also has not shown prejudice arising from counsel's actions during jury selection. "Nothing in the record suggests the actual jury was biased, or that it is reasonably probable a different jury would have been more favorably disposed towards defendant." (*Freeman, supra,* 8 Cal.4th at p. 487.)

For these reasons, we conclude that Muratalla has not established ineffective assistance of counsel based on his counsel's conduct during jury selection.5 Cases he cites do not persuade us otherwise. In *Winn v. State* (Tex.App.1993) 871 S.W.2d 756, 763, the appellate court concluded that defense counsel's performance in not asking certain questions "demonstrates a lack of preparation." The record in this case, by contrast, does not demonstrate ineffective assistance; rather, it simply fails to disclose the reasons for counsel's actions, fails to prove that they were not based on sound tactical considerations, and fails to establish prejudice. In *Walker v. State* (Tex.App.2006) 195 S.W.3d 250, 256–257, a prosecution for resisting arrest, six prospective jurors identified themselves as working or having close relatives who worked in law enforcement. When the prosecutor asked them whether this background would affect them as jurors, one said it depended on the situation, and several others told stories about officers being injured or killed by suspects resisting arrest. Defense counsel asked no questions at all. Three of the people with law enforcement connections served as jurors. In a hearing on a new trial motion, defense counsel said it never occurred to him to ask whether the prospective jurors would be inclined to find law enforcement witnesses more credible and said that since he had been a law enforcement officer himself, he was certain they would not be biased. There is nothing similar in this case. Muratalla's defense counsel never stated any reasons for his tactical decisions, let alone obviously inadequate ones like these. Finally, in *People v. Wagner* (N.Y.App.1984) 104 A.D.2d 457, 459, among numerous other problems (e.g., he "displayed a forgetfulness of basic principles of criminal law and procedure" and his "opening statement was essentially irrelevant and incoherent"), defense counsel did not challenge any prospective juror peremptorily or for cause, and the result was a jury that "resembled 'a miniature police force,' in that 9 of the 12 jurors had friends or relatives on various police forces, and one juror had two sons who were police officers...." This case is not similar.

*Muratalla*, 2014 WL 280624, at *8-9.

The conduct of voir dire "will in most instances involve the exercise of a judgment which should be left to competent defense counsel." Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980). In addition, counsel's reliance on the jurors' commitment that they "would be fair and would follow the law as instructed" . . . "merits deference as a tactical decision." Wilson v. Henry, 185 F.3d 986, 991 (9th Cir. 1999) (citing Strickland, 466 U.S. at 689). Furthermore, a petitioner's failure to show that any juror who harbored an actual bias was seated on the jury as a

1    result of counsel's failure to voir dire is fatal to his claim, since he has not made the required

2    showing of prejudice under Strickland.  Ybarra v. Daniel, 656 F.3d 984, 1001 (9th Cir. 2001).

3        The Court concludes there was no ineffective assistance with respect to voir dire since

4    Petitioner has failed to proffer any evidence as to actual bias on the part of any juror.  In addition,

5    there is no showing that a different result would have occurred had counsel further questioned the

6    jury panel about bias in favor of law enforcement.  The jurors were extensively questioned by the

7    trial court, and the jurors all represented that they would "apply [the] rule of law, [the] burden of

8    proof, and return a verdict of guilty if, and only if, the evidence presented by the prosecution

9    persuades you of the defendant's guilt beyond a reasonable doubt."  (RT 56.)

10                    ii.    *Opening Statement*

11       Petitioner next alleges defense counsel rendered ineffective assistance by failing to make

12   an opening statement.  He claims that counsel's trial strategy was to focus the jury on two issues:

13   1) the intent with which the petitioner had fired the gun; and 2) whether the reason for the

14   shooting was personal or to benefit the gang.  He alleges that defense counsel's failure to make

15   his strategy known to the jury in an opening statement constituted ineffective assistance.

16       The state court rejected this assertion as follows:

17       Next, Muratalla contends that his trial counsel rendered ineffective assistance by
         not making an opening statement. This argument is without merit. As Muratalla
18       concedes, trial counsel's decision "whether to waive opening statement" is a matter
         "of trial tactics and strategy which a reviewing court generally may not second-
19       guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) Muratalla contends that
         his trial counsel could not have had a strategic reason for presenting no opening
20       statement because he had already indicated at a prior hearing that his strategy
         would be to challenge the prosecution's proof of intent and gang-relatedness, and
21       there was no reason not to call the jury's attention to these points in an opening
         statement. Even under these circumstances, however, it could be a sound tactic to
22       wait until after the prosecution presented its evidence to make a final decision
         about how best to defend the case. The record shows neither that it was
23       professionally unreasonable not to make an opening statement, nor that there is a
         reasonable probability that making one would have led to a different outcome.
24

25   Muratalla, 2014 WL 280624, at *10.

26       An attorney's decision not to make an opening statement is generally presumed to be a

27   matter of trial strategy, and therefore does not constitute deficient performance.  See, e.g., United

28   States v. Rodriguez–Ramirez, 777 F.2d 454, 458 (9th Cir.1985) ("The timing of an opening

1    statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial

2    tactics and in such cases will not constitute the incompetence basis for a claim of ineffective

3    assistance of counsel."); see also Jones v. Smith, 772 F.2d 668, 674 (11th Cir.1985) (attorney's

4    decision to waive opening argument was one of reasonable trial strategy because it "left the

5    defense uncommitted to a particular position and thus free to develop any defense that might

6    materialize as the [prosecution] presented its case").

7         In this case, it is unknown why counsel did not make an opening statement.  In any case,

8    even if the Court assumes that counsel rendered ineffective assistance, Petitioner cannot show

9    that he was prejudiced by counsel's failure.  Petitioner has not identified any particular facts or

10   information that counsel could have conveyed to the jury in an opening statement which would

11   likely have altered the outcome of the case.  See, e.g., Moss v. Hofbauer, 286 F.3d 851, 863–64

12   (6th Cir. 2002) ("[Petitioner's] conclusory allegations are insufficient to justify a finding that an

13   opening statement would have created the reasonable probability of a different outcome in his

14   trial."); Nguyen v. Reynolds, 131 F.3d 1340, 1350 (10th Cir. 1997) (concluding no prejudice

15   resulted from counsel's tactical decision not to make an opening statement).

16                              iii.      *"Other Crimes" Evidence*

17        The petitioner claims defense counsel failed to bring a motion in limine or object to the

18   prosecutor's gang expert testimony concerning the petitioner's extensive criminal history, and to

19   Delarosa's prior statement that he had assaulted the petitioner because he was "beating people up

20   too much."

21        In rejecting this claim, the state court reasoned as follows:

22        Muratalla argues that several items of evidence revealed prior crimes of which
          Muratalla had been suspected or accused, and that this evidence was inadmissible
23        and prejudicial. He says his trial counsel rendered ineffective assistance by not
          objecting to it.
24
25        As part of his expert testimony, Officer Harless testified that he reviewed 16
          records of Muratalla being booked in to jail. These records supported Harless's
26        opinion that Muratalla was a gang member because, in each booking, Muratalla
          "claimed South, Southside, Bakers or something to that effect" so that he would be
27        housed away from Norteños. Muratalla says the booking records were irrelevant,
          and Harless should not have been permitted to mention them, because they showed
28        only that Muratalla was a Sureño—not a Loma Baker—and the prosecution's
          theory was specifically that he was a Loma Baker. We disagree. The Loma Bakers

are a subset of the Sureños. Evidence that someone is a Sureño has a tendency in reason to support the proposition that he is a member of a particular subset since, logically, he could not be a member of the subset unless he were also a Sureño. For this reason, each booking record was admissible. Further, all were probative. A current denial of gang membership is more effectively undermined by many past instances of membership affirmance, spanning a significant period of time, than by a few past instances. The fact that evidence tends to strongly prove a charged allegation, rather than weakly, does not show that it is substantially more prejudicial than probative under Evidence Code section 352. We do not think that statute entitled Muratalla to hide most of his many admissions of gang membership in order to avoid revealing his many arrests to the jury. Trial counsel's failure to object was not professionally unreasonable because the evidence was relevant and admissible as a basis for Harless's opinion.

A similar analysis applies to Muratalla's argument that the booking records should have been objected to as cumulative because Harless testified that he also knew Muratalla was a Sureño gang member from Bakersfield from his tattoos. The tattoos were comparable to admissions on Muratalla's part that he was a gang member. A larger number of admissions adds weight to the prosecution's contentions, and does so fairly. Evidence that a gang member has frequently made a point of declaring to the world that he is a gang member is not unduly prejudicial evidence in support of gang allegations.

Muratalla discusses seven other points on which he believes his trial counsel should have raised the objections that evidence was irrelevant, was inadmissible hearsay, was substantially more prejudicial than probative under Evidence Code section 352, or all three:

> 1. Harless mentioned the 19 offense reports he reviewed, but said only four of these were significant for purposes of his expert testimony. Muratalla maintains that the existence of the other 15 was irrelevant and prejudicial.

> 2. Harless discussed Muratalla's contact with police on August 21, 2009, saying it was significant because police found Muratalla in the company of a Loma Baker member. Harless went on, however, to reveal other details of that contact: Muratalla put something in his mouth which the officers believed was heroin; his companion was in possession of a counterfeit check; and Muratalla and his companion were both arrested for parole violations at that time. Muratalla says that all these details were irrelevant because Harless said the contact was significant only because Muratalla was found with another gang member; and they were prejudicial because they were evidence of Muratalla's bad character.

> 3. Harless said Muratalla's April 1, 2005, contact with police was significant for purposes of his expert opinion because Muratalla was arrested for vehicle theft, which Harless said was a primary activity of the Loma Bakers. But Harless went on to say that Muratalla had been disturbing the peace before the officers arrived, that he discarded a methamphetamine pipe when they arrived and was arrested for possession of drug paraphernalia, and that he was in possession of counterfeit money. Again, Muratalla argues that this additional information was irrelevant and prejudicial.

> 4. Further, Muratalla was never charged with vehicle theft as a result of the April 1, 2005, contact, so the evidence of that contact was not even

24

relevant to show he committed a vehicle theft.

5. Even if Muratalla did commit a vehicle theft, he argues, that would not show he is a member of a gang that commits vehicle thefts. Many people commit vehicle thefts without being gang members.

6. Harless said the report of Muratalla's contact with police on April 14, 2004, was significant for purposes of his expert opinion because Muratalla was found in possession of a knife and arrested for carrying a concealed weapon, weapon possession being a primary activity of the Loma Bakers. Again, Muratalla argues that the evidence did not support Harless's opinion. Offenses that form the primary activities of gangs are often committed by people who are not gang members.

7. In a recorded statement, the victim, Delarosa, said he participated in a beating administered to Muratalla as gang discipline on the orders of gang leaders who were dissatisfied with Muratalla's performance as a gang member. Muratalla had been "beating people up too much." The recording was hearsay admissible as a prior inconsistent statement, because Delarosa testified that he did not remember the incident. Muratalla argues, however, that the reason for the gang discipline—that Muratalla was beating people up too much—was not part of the prior inconsistent statement, and was prejudicial.

Assuming meritorious objections existed on each of these points, we conclude that Muratalla has not shown he was prejudiced by counsel's failure to make them. He says he was prejudiced because evidence that should have been excluded was admitted and tended to show he had a bad character, making the jury more likely to find him guilty as charged, more likely to find him to be a gang member and more likely to find the offense to be gang-related. By arguing for a lesser offense, however, Muratalla effectively conceded that he shot Delarosa and argued only that he had no intent to kill him. There was nothing about Muratalla's prior arrests and offenses that tended to show he was the kind of person who intended to kill others. As for the gang allegations, there was very powerful admissible evidence in support of them. Muratalla had gang tattoos, admitted he was a gang member to booking officers 16 times, was identified by Delarosa as a Loma Baker, and received gang discipline in jail. He initiated the confrontation with Delarosa using the language of a gang challenge. Harless's expert testimony supported the conclusion that it was a gang-related confrontation. And there was no reasonable doubt that the Loma Bakers are a criminal street gang. There is no reasonable probability that Muratalla would have obtained a better outcome if his counsel had made objections on these issues.

Muratalla, 2014 WL 280624, at *10–11.

With respect to the sixteen jail bookings, the state court found no merit to Petitioner's proposed objection since the jail bookings were relevant and admissible. They were properly admitted as the foundation of the gang expert's opinion that Petitioner was a Loma Bakers gang member. Therefore, any objection would have been meritless, and counsel cannot be faulted for failing to make a meritless objection. Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005). For

1   the same reason, Petitioner cannot establish prejudice from counsel's alleged failure.

2          Likewise, Petitioner's contention that counsel should have objected to the four incidents

3   of gang-related criminal activity is without merit. The incidents were determined to be relevant

4   and admissible as support for the gang expert's opinion that Petitioner was a Loma Bakers gang

5   member. Counsel did not err in failing to raise a meritless objection, and Petitioner did not suffer

6   prejudice.

7          Concerning Delarosa's statement that he previously attacked Petitioner because Petitioner

8   had been "beating people up too much," Respondent is correct that Delarosa's motivation was

9   highly relevant and admissible to rebut the defense theory that their dispute was solely over a

10  woman and had nothing to do with gangs. In addition, the admission of the statement was not

11  prejudicial. Delarosa had testified concerning his motivation for attacking Petitioner in jail;

12  therefore, any error caused by the duplicative admission of the prior recorded statement was

13  harmless.

14                          iv.    *Closing Statement*

15         Petitioner argues that defense counsel's closing argument was deficient. He claims

16  defense counsel could have argued more to explain the defense theory that Petitioner did not

17  intend to kill Delarosa, and that their conflict was personal and not gang-related.

18         The state court rejected Petitioner's claim as follows:

19     Defense counsel's closing argument developed two themes: the evidence did not
       show that Muratalla had an intent to kill Delarosa and the conflict between the two
20     men was over a woman and was not gang-related. Muratalla now argues that this
       closing argument was constitutionally inadequate because counsel could have done
21     a better job of developing these themes. He presents a list of details he feels trial
       counsel should have focused on:
22
23        1. Defense counsel did not emphasize the elements necessary for a finding
          of premeditation and deliberation; he should have done so in response to
          the prosecutor's argument that premeditation and deliberation are like
24        deciding whether to proceed through a yellow light.

25        2. Defense counsel did not reiterate the jury instruction stating that if
          Muratalla's intent were subject to two reasonable interpretations, the jury
26        was required to adopt the interpretation under which Muratalla was less
          culpable.
27
28        3. Defense counsel did not point out certain facts arguably undermining the
          claim that he intended to kill and supporting the view that he acted

                                          26

thoughtlessly and impulsively: Muratalla left the scene with bullets left in his gun and Delarosa still standing; there was no evidence that Muratalla expected to encounter Delarosa that day and brought a gun with a plan to shoot Delarosa in mind; Muratalla could have been carrying the gun for protection; Delarosa said Muratalla looked "tweaked out" this was not suggestive of a cold and calculating mood; Delarosa told Muratalla to leave and Muratalla responded by saying "fuck this" and drawing the gun.

4. Defense counsel did not emphasize facts that could undermine the theory that the shooting was gang-related: When Muratalla approached Delarosa and asked if he was Fernando Delarosa from the south side, he could have simply been trying to ascertain Delarosa's identity, not challenging him to engage in a gang conflict; Delarosa had never had a conflict with a Loma Baker before and while he had seen Loma Bakers members "trying to gang bang on" Southside Bakers, he classified these as personal conflicts, not gang conflicts; although Delarosa knew Muratalla as "Oso from Loma Bakers," it remained possible that (unknown, somehow, to Delarosa) Muratalla and Delarosa were actually both members of Southside Bakers.

Muratalla's critique of the fine-grained details of counsel's closing argument does not establish ineffective assistance of counsel. Our review of the professional reasonableness of counsel's tactical choices is deferential, and in the absence of record evidence of the reasons for counsel's approach, we do not find reversible error unless there simply could be no good reason for it. The record does not reveal counsel's reasons, and it is not the case that there could be no good reason for presenting the defense themes in a briefer manner that Muratalla now wishes his counsel had done. Further, Muratalla's critique does not demonstrate prejudice. We cannot say it is reasonably probable that the jury would have reached a different verdict if defense counsel's closing argument had focused on the details Muratalla now lists.

Muratalla, 2014 WL 280624, at *12.

The Supreme Court has held that "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003). "Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether." Id. (citing Bell v. Cone, 535 U.S. 685, 701-702 (2002)) (internal citations omitted). Accordingly, "[j]udicial review of a defense attorney's summation is therefore highly deferential - and doubly deferential when it is conducted through the lens of federal habeas." Yarborough, 540 U.S. at 5-6.

The state court's determination was not unreasonable. While counsel's summation was

1  relatively short, it still addressed the defense theory in some detail.  (RT 488-95.)  Defense

2  counsel addressed the prosecutor's legal theory, the credibility of the victim and witnesses, and

3  the state of the evidence.  Counsel further argued the defense theory of the case: that Petitioner

4  did not have the intent to kill, and that the incident was not gang-related.  Petitioner may have

5  desired a lengthier summation with additional points, but this does not constitute ineffective

6  assistance.  Given the double deference owed to defense counsel's summation, the Court cannot

7  find the state court rejection of the claim to be unreasonable.

8                              v.      *Prosecutor's Rebuttal*

9              Petitioner contends that counsel was ineffective in failing to object to the prosecutor's

10  rebuttal argument that the jury was "not allowed to rely upon conjecture" when evaluating the

11  evidence and the credibility of the witnesses.

12        The state court rejected Petitioner's claim as follows:

13        An eyewitness, Sergio Merino, testified that he saw Muratalla pointing the gun
          "[d]irectly at him," i.e., at Delarosa. In his summation, defense counsel made
14        remarks that appeared to be intended to undermine this testimony. He said that
          because the police searched for and did not find evidence of bullet strikes on
15        buildings downrange from Delarosa, the barrel of Muratalla's gun must not have
          been pointed "in the direction of the person running away," i.e., must not have
16        been pointed toward Delarosa. In his rebuttal argument, the prosecutor made the
          following remarks, apparently in response to these comments by defense counsel:
17
18            "Now, in this case, you're only allowed to rely upon the evidence. You're
              not allowed to rely upon conjecture—oh, he must have [been] shooting in
19            the air. No.

20            "Sergio Moreno got on the stand. He was asked where was the gun pointed.
              Directly at the person running away. You have an eyewitness to the event
21            telling you exactly where the gun was pointed.

22            "Okay. Whether a tiny little .22 shell was found in a wall, that's—you can't
              get the inference from that that he was shooting wildly into the air.

23            "The direct evidence of an eyewitness tells you where Mr. Muratalla was
24            shooting. That is what you can rely upon.

25            "There's no evidence that he was shooting in the air, none whatsoever. You
              cannot rely upon that.

26            "You can rely upon the evidence, the documents, the photos, the
27            testimony—not conjecture, not stuff that's just made up."

28        Muratalla now argues that these remarks misstated the law by implying that the
          jury could not rely upon a lack of evidence in concluding that there was a

                                            28

reasonable doubt of his guilt. (See People v. Simpson (1954) 43 Cal.2d 553, 566["[R]easonable doubt ... may well grow out of the lack of evidence in the case as well as the evidence adduced."].) He says his counsel rendered ineffective assistance by not making an objection to that effect.

We do not see how an objection on this point could have made any difference to the jury. It is undisputed that a bullet from Muratalla's gun struck Delarosa. Muratalla does not suggest that the bullet ricocheted. This means the gun necessarily was fired directly at Delarosa at least once. If all four shots had missed, Muratalla could rationally have made an argument that he never pointed the gun directly at Delarosa, and then used that argument to support a further argument that he had no intent to kill. As it was, however, the eyewitness's testimony that the gun was pointed "directly at" Delarosa only stated what was already obvious from the undisputed facts. An objection to the prosecutor's comments about evidence versus conjecture, even if sustained, therefore could not rationally have had any impact on the jury's conclusions about whether the gun was fired directly at Delarosa. It follows that there is no reasonable probability that Muratalla would have obtained a better outcome if his counsel had objected.

Muratalla also briefly mentions that during his rebuttal argument, the prosecutor implied that any shooting in which a victim is injured is always attempted murder and never assault with a firearm. He does not present any arguments or cite any authorities on this subject. He also does not mention that the prosecutor made similar comments during his initial closing argument, that defense counsel objected, that the objection was sustained, or that defense counsel explicitly criticized the prosecutor on this point in his closing statement. Because Muratalla does not present any arguments or cite any authorities to support this subject, we conclude that he has forfeited this issue. (Associated Builders & Contractors, Inc. v. San Francisco Airports Com. (1999) 21 Cal.4th 352, 366 fn. 2. [Points that are not supported by analysis of the facts and citation of legal authority are deemed forfeited.].)

Muratalla, 2014 WL 280624, at *12-13.

"Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir.1993) (citing Strickland, 466 U.S. at 689).

Here, too, the state court determination was not unreasonable. There is no question that a bullet fired from Petitioner's gun struck Delarosa, and there is no evidence that the bullet that struck Delarosa had first ricocheted. Therefore, the gun obviously must have been pointed at Delarosa at least once. Any objection to the prosecutor's argument concerning evidence versus conjecture, even if sustained, would have made no difference to the jury's verdict.

In sum, Petitioner fails to demonstrate that the state court determinations of his multiple claims of ineffective assistance were an unreasonable application of the Strickland standard.

29

1   **V.      RECOMMENDATION**

2          Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus

3   (Doc. 1) be **DENIED** with prejudice on the merits.

4          This Findings and Recommendation is submitted to the United States District Court Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

6   Local Rules of Practice for the United States District Court, Eastern District of California.

7   **Within 21 days** after being served with a copy of this Findings and Recommendation, any party

8   may file written objections with the Court and serve a copy on all parties.  Such a document

9   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

10   to the Objections shall be served and filed **within 10 days** after service of the Objections.  The

11   Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The

12   parties are advised that failure to file objections within the specified time may waive the right to

13   appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

14

15   IT IS SO ORDERED.

16   Dated:   __October 23, 2016__                    _____/s/ Jennifer L. Thurston_
                                                      UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21

22

23

24

25

26

27

28